CIVIL ACTION NO. 2009-023 (WOB-JGW)

PARRISH LATTIMORE                                    PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

WILD FLAVORS, INC.                                   DEFENDANT


This matter is before the Court on the motion of plaintiff for partial summary judgment (Doc. 49) and the motion of defendant for summary judgment (Doc. 50).

The Court heard oral argument on these motions on December 12, 2001, and thereafter took them under submission. (Doc. 74).

Having reviewed this matter further, the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

Plaintiff Parrish Lattimore, an African-American male born March 13, 1964, was hired by defendant Wild Flavors, Inc. effective May 21, 2007, to work at the company's facility in Erlanger, Kentucky. Operations Manager Pete Kindzierski interviewed Lattimore and, in consultation with Human Resources Senior Director Linda Haering, made the decision to hire him. (Hearing Aff. ¶ 3; Kindzierski Depo.

at 36).[1]

Wild Flavors develops and manufactures liquid flavorings; Lattimore was hired to work as a packer on the third shift in the Liquids Department. Packers are responsible for packaging, labeling and sampling products and for general cleaning. Plaintiff was trained on all steps needed to perform his duties. (Lattimore Depo. at 130).[2]

New employees at Wild Flavors are subject to a 90-day probationary period. (Lattimore Depo. at 128). During plaintiff's probationary period, supervisors documented several problems with his performance:

- June 8, 2007: Plaintiff failed to pack and label an order accurately;

- June 14, 2007: Plaintiff did not complete proper clean up while packing and was observed walking around the parking lot during his shift; and

- June 23, 2007: Plaintiff left his work area to change clothes prior to the end of his shift.

These problems were documented electronically in a shared database file where supervisors made notes for their own reference. (Doc. 61-32; Begley Depo. at 82, 123, 181-82).[3] These issues were brought to plaintiff's attention.

---

[1] Haering's Affidavit is attached to defendant's motion for summary judgment. (Doc. 50). Kindzierski's deposition is Doc. 54.

[2] Plaintiff's deposition is Doc. 61.

[3] Begley's deposition is Doc. 52.

(Lattimore Depo. at 232).

On July 14, 2007, plaintiff received a written Disciplinary Warning for improperly packaging two separate batches of flavoring as one, causing a loss of 13 machine hours and 11.31 labor hours, at a cost of $3,850.55. (Doc. 61-33).

Despite these problems, plaintiff completed his probationary period and advanced from packer to Associate Operator on August 13, 2007, with an increase in pay of $1.25 per hour.[4]

On September 19, 2007, supervisor Dwight Moody spoke to plaintiff about problems with his productivity. (Doc. 61-32). Moody noted that plaintiff's packing and labeling of an order the previous day was incomplete and that he had left his work area a "mess." Moody told plaintiff that this created additional work for other employees and was "unacceptable." (*Id.*).

On October 7, 2007, supervisor James Begley, who was new to the area, noted that plaintiff was making packaging and labeling errors that created "un-needed re-handling and re-labeling" and "a great deal of confusion." (Doc. 61-

---

[4] The parties dispute whether this advancement was a performance-based "promotion." Plaintiff so contends, while defendant maintains that it was simply a progression that occurred automatically once the employee completed his probationary period. (Haering Aff. ¶ 7). The Court finds this dispute immaterial to the outcome of the motions before it.

32).  Begley noted that he intended to speak to Moody about these issues.

Around October 19, 2007, plaintiff began keeping a log of events that he believed "showed retaliatory [sic] and discrimination."  (Lattimore Depo. at 143-46; Doc. 61-27).  He kept these notes in his locker.

In October or November 2007, supervisors met to discuss employee performance reviews for that year.  (Begley Depo. at 108-09).  The supervisors held group discussions, comparing different employees' performance levels and eventually determining a rating for each employee in various categories.

Begley completed plaintiff's review, assigning him an overall score of 1.57 out of 4.0.  (Begley Depo. 107, Exh.7 (Doc. 52-5 at 18)).  Supervisors were required to turn in their performance reviews to Kindzierski by the first week of December 2007, and the reviews were then submitted to Human Resources.  (Begley Depo. at 114-15; Haering Depo. at 27-30).  The reviews were not finalized and discussed with employees until January or February 2008.  (Begley Depo. at 121).[5]

On December 17, 2007, Begley assigned plaintiff and

_____

[5] As discussed below, plaintiff received this review on or about February 13, 2008.

two white employees to clean-up duty in the packing area.
(Lattimore Depo. at 193-94).  While plaintiff was sweeping
the floor with a mini-broom and dust pan, Begley walked by
and said: "What are you practicing so you can sweep at the
zoo?"  (Lattimore Depo. Exh. 30 at 1) (Doc. 61-30).
Begley, who testified that he was in a good mood because he
was about to leave on vacation and was joking with
plaintiff (Begley Depo. at 138-39, 149), then walked
through the area and returned to his office.

Plaintiff was offended by this remark and considered
it racist.  He asked one of the white employees, Greg Rabe,
what Begley meant by the comment.  Plaintiff then spoke to
supervisor Terry Jackson, who is African-American, and told
him about the comment.  Jackson asked plaintiff if he
wanted him (Jackson) to talk to Begley, but plaintiff said
he was going to ask Begley what he meant.  (Doc. 61-30 at
1).

Plaintiff then went to Begley's office and asked him
what he meant by the comment.  (Lattimore Depo. at 212).
Begley responded that it was a joke.  Plaintiff then
returned to the packing area and told Jackson what Begley
had said.

Shortly thereafter, Begley came out of his office and
approached plaintiff.  Begley told plaintiff that he wasn't

trying to be inappropriate, that his comment referred to an old joke "about a guy who wanted to work at the zoo so he started sweeping." (Lattimore Depo. at 214-15; Begley Depo. at 154; Doc. 61-30 at 2). Plaintiff told Begley that he didn't appreciate the comment, that he felt like he needed to look for another job, and that the situation "needed to be documented" with Kindzierski or Haering in Human Resources. (Doc. 61-30 at 3). Begley told plaintiff that was fine, that he could talk with either one about the situation. (Lattimore Depo. at 225).

Begley himself thereafter contacted both Kindzierski and Haering to inform them of the incident. (Begley Depo. at 155).

Later in the shift, plaintiff told Begley he wanted to let the whole thing go, (Begley Depo. at 155), but Begley told plaintiff that he had already reported the matter. (Lattimore Depo. at 234).

The next day, plaintiff prepared a written account of this incident. (Doc. 61-30). The same day, Kindzierski met with Begley and verbally counseled him, documenting the discussion with a memorandum:

> On December 19th James Begley was verbally counseled on sensitivity to all operators in response to a complaint made by an operator. James was attempting to joke around with some operators when one of the operators took offense to the comment made. James has

been spoken to by me, to ensure that he thinks before
he speaks to the operators on the floor, even if he
feels that he [is] only joking.  All supervisors will
be going through sensitivity training which is being
set up by WILD's training department to ensure all
supervisors are aware of the environment in which we
work.

(Doc. 52-5 at 33) (Begley Depo. at 163-64; Kindzierski

Depo. at 11)[6].

Haering also directed Kindzierski to conduct an

investigation into the incident.  (Haering Depo. at 41-43).

Over several weeks, Kindzierski interviewed employees and

supervisors who were working at the time of the incident.

He then reported this information to Haering.

Haering and Kindzierski concluded that while

unprofessional, Begley's comment to plaintiff had no racial

connotations.  (Haering Affidavit ¶ 10).  Hearing did not

tell plaintiff that Begley had been counseled about the

comment because she does not discuss such matters with

other employees.  (Haering Depo. at 108; Haering Aff. ¶

12).

---

[6] Plaintiff states in his motion for partial summary judgment that Begley
"was unaware that he had been disciplined for the incident."  (Doc. 46
at 4)  This mischaracterizes the testimony.  Begley testified that,
while he had not previously seen this written memorandum (in fact, he
had never looked at his own personnel file), he was verbally counseled
by Kindzierski and required to attend training.  (Begley Depo. at 135,
166).  He testified that he did not consider those measures to
constitute "discipline."  (*Id.*).  Haering confirmed, however, that such
counseling is considered part of the company's overall progressive
discipline policy.  (Haering Depo. at 65-66).  In any event, Begley's
opinion on this issue is immaterial as it is undisputed that the
company took the measures described.

In the meantime, on December 27, 2007, Wild Flavors was notified by its Russian affiliate of a "non-conforming" shipment. (Doc. 53-3 at 2-3; Doc. 52-5 at 27). The affiliate stated that two drums of liquid flavoring were leaking from the caps when they were received. The drums were shipped from the Erlanger facility in August 2007, but the Russian affiliate did not receive them until December due to long shipping times. (Kindzierski Aff. ¶ 19). Wild Flavors directed the affiliate to destroy the products because it would cost too much to ship them back to the United States. (*Id.*). This caused a loss to Wild Favors of $5,479.88.

Wild Flavors Quality Control determined that the caps on the drums in question had not been tightened prior to shipment, which was communicated to Kindzierski on January 2, 2008, along with photos of the leaking drums. (Doc. 52-5 at 26). Kindzierski reviewed the computer records to determine which operator packed the shipment, and he determined that it was plaintiff. (Kindzierski Aff. ¶ 20). Kindzierski also learned from the affiliate that the seals over the caps on the drums were intact, which indicated to him that no one had touched the caps after they had been sealed. (*Id.*). Kindzierski thus determined that plaintiff

was responsible for the leaks. (*Id.*).[7]

On January 3, 2008, Kindzierski emailed supervisors stating that he wanted to meet with plaintiff the next morning regarding the non-conforming shipment. (Doc. 52-5 at 25).

Kindzierski met with plaintiff on Friday, January 4, 2008. Because he was still also investigating the December 17 incident and had not yet had an opportunity to interview plaintiff about it,[8] Kindzierski first raised that matter. Plaintiff recounted the "zoo" remark incident in accord with his written statement. Based on his interviews with the two employees who were also present at the time, Kindzierski suggested to plaintiff that plaintiff may have "over reacted," but he told plaintiff that he would continue investigating and that plaintiff would be treated with respect and professionalism by his supervisors. (Doc. 53-3 at 9).

Kindzierski then raised the leaking drums matter. Plaintiff became upset when Kindzierski showed him the records that showed he had packed the drums, and he denied that he failed to tighten the caps. (Kindzierski Aff. ¶

---

[7] Also, on December 29, 2007, before the leaking barrel problem came to a head, Begley noted in the electronic supervisor file that plaintiff had failed to label a container he packed and "left it to sit." (Doc. 61-32 at 1).

[8] Apparently plaintiff had been on vacation.

22; Doc. 53-3 at 9).  Plaintiff also questioned the timing of this discussion, and Kindzierski explained that the company had just learned about the leaking drums because of long shipping times.  (Kindzierski Aff. ¶ 22).  Plaintiff then commented, "I see where this is going."  (Doc. 53-3 at 9).  Plaintiff left the office but later returned and told Kindzierski that he wanted to speak to Haering. Kindzierski responded that was fine but that Haering would not be in until later.

Later in the morning, Kindzierski emailed Haering to tell her that "Vern"[9] informed him that plaintiff was trying to get Vern "involved" because plaintiff was not satisfied with his discussion with Kindzierski.  (Doc. 54-2 at 10). Vern told plaintiff he needed to "see someone higher because he has nothing to do with it."  (*Id.*).

Kindzierski directed Begley to issue plaintiff a documented verbal counseling for the leaking drums, which Begley did the following day.  (Doc. 53-3 at 1).  Plaintiff refused to sign the form.  (*Id.*).

Begley emailed Kindzierski after his meeting with plaintiff:

> I spoke with Parrish in regards to the non-conformity and he refused to sign the verbal write-up.  He said

---

[9] Plaintiff testified that Vern Fields was an older, African-American supervisor.  (Lattimore Depo. at 540).

he was not going to sign it because he talked to you
about it and my name was on the paper (in the held by
section).  He also stated that the item in question
was packed in [A]ugust and asked why it was not an
issue until now.  I explained that it was a shipment
to Russia and by the time all the paper work had been
done and the ship time that it took to arrive we did
not receive the non-com until now.  Your thoughts on
how to proceed?  Mr. Lattimore is becoming an
inconvenience to me and for my shift he has been going
around talking to everyone trying to get people to
side with him and go to HR and discussing ME with
other operators.  How I have been in the past and
different things like that.  I am not mad about this
situation and I have maintained a professional
attitude when handling Parrish but something needs [to
be] done and as fast as possible if possible.

(Doc. 52-5 at 23-24).

    Kindzierski responded:

Who has he been speaking to and is causing
distractions?  Is anyone complaining about him and
what he's saying . . . if so, I would like statement
from these people.  I need as much detail as possible
for when I talk to Linda on Monday!

(Doc. 52-5 at 23).

    Begley replied that Darryl King, an African-American

operator, had told him about plaintiff telling other

employees that he had been treated unfairly, asking them if

they wanted to go to Human Resources, questioning other

employees in ways that they reported made them "uneasy,"

and "killing the general morale." (*Id.*).  On January 6,

Kindzierski forwarded this email chain to Haering and Dan

Holtzleiter, Senior Director of Operations, along with the

electronic supervisors' notes regarding plaintiff's

performance.  (*Id.*).

On January 10, 2008, Haering met with plaintiff at his request, along with Holtzleiter.  (Haering Depo. at 46, 105).  Plaintiff stated that he still was not satisfied with the company's response to the incident with Begley, but he did not request any specific action.  (Haering Depo. at 105-06).  Haering told plaintiff that if he wanted, he could change teams so that Begley would no longer be his supervisor.  (Haering Depo. at 48, 61, 106; Haering Aff. ¶ 13).  Plaintiff agreed to this change and testified that he was not upset by it.  (Haering Depo. at 106; Lattimore Depo. at 254).  Don Cosby, who is also African-American, thereafter became plaintiff's primary supervisor.  (Haering Depo. at 153).

Haering's notes of this meeting reflect that plaintiff also stated that he thought the write-up for the leaking drums was retaliatory (Doc. 54-2 at 7), but the record does not reflect whether this was actually discussed during the meeting.

On or about January 12, 2008, plaintiff's attorney faxed a letter to Haering asking that a legal representative for plaintiff be permitted to attend a meeting scheduled for January 15.  (Doc. 53-3 at 7). Haering testified that she forwarded this letter to the

company's legal department.  (Haering Depo. at 35-38).

Plaintiff and Haering met again briefly on January 15, 2008.  (Haering Depo. at 156).  Haering summarized the meeting in an email to Terry Jackson, an African-American supervisor who had met with plaintiff earlier that day regarding his shift change, with copies to Kindzierski and Dave Haase, Vice-President of Operations:

> I did meet with Parrish at 6:15 a.m. very briefly.  I asked him if there was anything in particular he wanted to talk about, he said "no".  I asked if Pete had informed him of moving to the "B" Team, he said "yes".  I said that I hoped the change would provide him an opportunity to be successful as WILD tries to provide resources for our employees to be successful. He stated that he "didn't know what good it will do". I did not comment on this.  He said that he needed to speak to someone higher as he wants to "put to bed" the comment that was made to him because right now he feels it is "being swept under the carpet".  He said that he guessed the next person to speak to would be Kevin [Gavin, the Chief Operating Officer].  I said that to stay in the chain of command he would want to speak with Dave Haase (he did not know who he was or his position).  I gave him Dave's direct phone number and asked if he would like me to arrange a meeting. He said "no that he had no problem calling him."  He also asked me for a copy of his job description and pages 39-47 of the Policy Manual as he is missing those pages.  I told him I would get these for him and give to Pete to get to him.  He said "thank-you" and left.

(Doc. 51-4 at 20).  Plaintiff scheduled a meeting with Haase but later cancelled it.  (Lattimore Depo. at 251; Haering Aff. ¶ 13).

Kindzierski forwarded Haering's email to Holtzleiter,

who responded:

> Linda and Dave just a couple of comments.
>
> Parrish states that he thinks we are sweeping this under the rug. Which we all know is false. James in the presence of Terry has apologized for the statement. Pete has had discussions with him. Linda and I met with him. We are switching his shift to put him on a more comfortable shift, away from his current shift. He spoke to Pete again, and then now again with Linda. He wants to go higher.
>
> I am willing to state that if he speaks to Dave that he will not say it is done. What does he want? I feel strongly that we have done all that we can do. If he starts and is disruptive on his new shift what steps can I advise Pete and the supervisors to take? At this time everyone is very tentative to take any action. This man is disruptive to the work force and something must be done to end this.

(Doc. 53-3 at 23).

Haering replied that she understood the concern regarding the disruptiveness and recommended that all concerns be documented. (*Id.*).

Also on January 15, 2008, a supervisor noted in the computer file that plaintiff failed to take samples of a product as he was supposed to do. (Doc. 52-6 at 59).

On January 17, 2008, the accounting department investigated why a batch of flavoring took thirty-nine hours to process when the estimated processing time was ten to twelve hours. (Kindzierski Aff. ¶ 25). The ensuing investigation revealed that the plaintiff was the packer on the product, which caused Liquids Supervisor George Svenson

to look into plaintiff's productivity. (*Id.*). Svenson determined that plaintiff had packed only six products in three days, well below expected productivity levels. (*Id.* ¶ 26; Doc. 53-3 at 19). Other supervisors also complained to Kindzierski about plaintiff's productivity. (Kindzierski Aff. ¶ 26).

On January 19, 2008, Begley emailed Kindzierski to tell him that employees were telling him that plaintiff "keeps a notebook with him on the production floor, he enters what jobs hes [*sic*] been assigned and asses[es] what everyone else is doing and writes that down as well along with conversations and things he has heard in passing." (Doc. 53-3 at 18). Begley also stated that another employee told him that plaintiff, after complaining about an assignment he thought was unfair, stated that he was going to "take [Begley] down." (*Id.*).

Kindzierski forwarded Begley's email to Haering and Holtzleiter, stating:

> **This guy is becoming very disruptive on the floor with the other operators and my supervisors feel very uncomfortable dealing with him. He starts on the B team Monday night, what can I do if this continues?**

(*Id.*) (emphasis added).

Holtzleiter responded:

> We offered this gentleman the opportunity to speak with Dave and he has not done this up [to] this point.

**Now reading this, this gentleman sounds to be very disruptive on the floor. If he is walking around with a notebook, how can he be doing his job? This is a bad situation, and only getting worse that we must take action on.**

**I think by the facts that we made a poor decision in this hire. When we meet on Monday, I would like to discuss what steps we can take to rectify this poor decision hire and move on.**

My point here is:
1) James made a dumb statement, but it was not racial.
2) In the presence of Terry Jackson and Daryl King he apologized to this individual, and that [was what] he (Parrish Lattimore) requested.
3) We are moving his shift from the "A" team to the "B" team.
4) Pete has discussed this issue with him.
5) Linda and I have discussed this issue with him.

**But yet he refuses to let this go, and now after reading this he is not performing, and frankly if I was supervising him, I would probably be very cautious as to saying anything to him either. But now we have come to [the] point that [t]his man is not performing, he is not doing his job, and enough is enough. Based on the actions and lack of performance of this individual, the facts [sic] that we have done all that we were instructed to do, he continues to draw this out, and frankly this needs to come to conclusion. My stance at this time is this: We made a poor decision with this hire and we must correct this before we continue to let this get out of hand and disruptive affecting the other employees that we have.**

(Doc. 53-3 at 17-18) (emphasis added).

Haase replied that he would like to suspend plaintiff with pay to investigate the situation and get a legal opinion. (Doc. 53-3 at 17). Finally, Kindzierski noted that he was "working" on the situation and that George Svenson had just discovered that plaintiff had been

16

assigned an order and that "nothing was done on it" and "in fact there is a full day of Parrish not doing anything." (*Id.*).

On February 13, 2008, Kindzierski and Haering met with plaintiff to present his 2007 performance review. They conducted the review instead of Begley, given the incident of December 17. (Kindzierski Aff. ¶ 28). Kindzierski told plaintiff that "he needed to focus more on his job tasks and to pay more attention to details." (*Id.*).

On March 29, 2008, plaintiff approached Cosby, his new supervisor, and told him he needed to talk to him. Plaintiff then began discussing the incident with Begley, and Cosby cut him off, as described in an email he sent to Kindzierski:

> I stopped him and said, "Parrish, I am going to assure you that I am not going to judge you by your past. As far as I am concerned you have a clean slate. I do not know anything about that situation or your past history here at WILD nor do I want to know. All I know is that you are here now and we are going to work together along w/ every other team member here and together we will all be successful." I shook his hand and said, "I think that's fair and lets [sic] move on from here." He seemed very receptive. . . . I am going to assume that Parrish is a good employee until he shows me different. This is his chance to turn over a new leaf.

(Doc. 51-4 at 26).

On March 31, 2008, Cosby emailed Kindzierski:

I had a talk with Parrish tonight about his time

17

> management. Parrish has not been working so I am
> presenting this observation to him and I will proceed
> further if this behavior continues.

(Doc. 51-4 at 25; Kindzierski Aff. ¶ 29). Kindzierski

responded: "What do you mean he has not been working???"

(*Id.*).

The following morning, Svenson emailed Cosby and other

supervisors, copying Kindzierski, about a problem the night

before where plaintiff failed to properly label two

products, which necessitated repacking, relabeling, and

extra work for the shift. (Doc. 51-4 at 13-14; Kindzierski

Aff. ¶ 30).[10]

After speaking with Haering, Kindzierski emailed

Cosby, directing him to issue plaintiff a write up:

> After speaking with Linda, Parish [*sic*] needs a write
> up for this lack of productivity for the day you spoke
> about and now this issue. They should both be
> contained in one write up. **We are under the
> microscope now pertaining to productivity and the last
> thing we need now in an employee who doesn't want to
> work. Our EBIT margin is extremely under budget and
> the reason we cannot replace any personnel that we are
> missing right now is because some of the existing
> personnel (not all), such as Parrish refuse to give us
> an honest days [*sic*] work.**

(Doc. 51-4 at 13) (emphasis added). Haering confirmed that

the write up should be a second written warning. (*Id.*).

Kindzierski told Cosby "not to mention the past but to

---

[10] This latter problem was also noted by Svenson in the supervisors'
computer file. (Doc. 52-6 at 59).

focus on the present issue." (Doc. 53-3 at 20).

On April 3, 2008, Cosby spoke to plaintiff regarding the packaging errors. In an email to Kindzierski describing this meeting, Cosby stated that plaintiff blamed another employee, but Cosby told plaintiff that he was responsible and was going to receive a written warning. (Doc. 53-3 at 20). Plaintiff told Cosby all his disciplinary write-ups were part of a "plot" against him that would "be addressed very soon." (*Id.*) Cosby also noted that plaintiff was "doing everything that you said he has done before" by bothering other employees on the production floor. (*Id.*).

Cosby gave plaintiff the written warning the same day. (Doc. 53-3 at 5). Cosby explained the facts that confirmed that the errors were plaintiff's fault and told him he was "the last line of defense when he is packing." (Doc. 52-5 at 31). Plaintiff initially refused to sign the write-up but later in the shift returned, admitted fault, and signed the warning. (Doc. 52-5 at 32).

Following the April 3, 2008, write-up, Kindzierski and Haering discussed how to proceed with plaintiff's employment. Based on plaintiff's performance issues, disciplinary action, and performance review, they recommended that his employment be terminated, and that

recommendation was approved by the Chief Operating Officer, Kevin Gavin. (Haering Depo. at 58-59, 73-74, 139-40; Haering Aff. ¶ 18; Kindzierski Depo. at 8-9; Kindzierski Aff. ¶ 31). Plaintiff's employment was terminated April 4, 2008.

Plaintiff filed this lawsuit on February 19, 2009, alleging claims for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981; retaliation under Title VII; and age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Doc. 1).

### *Analysis*

#### A.   <u>Race Discrimination</u>

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals with respect to the terms, conditions, or privileges of employment because of race. 42 U.S.C. § 2000e-2(a)(1). Section 1981, also invoked by plaintiff, prohibits race discrimination in the making and enforcement of contracts and has been applied to at-will employment relationships. *See Aldridge v. City of Memphis*, 404 F. App'x 29, 37 n.9 (6th Cir. 2010) (citation omitted). Claims under § 1981 are reviewed under the same standards as Title VII claims.

*Bobo v. United Parcel Serv., Inc.*, __ F.3d __, No. 09-6348, 2012 WL 34264, at * 13 (6th Cir. Jan. 9, 2012); *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 499 (6th Cir. 2011) (citation omitted).

### 1. Direct Evidence

A plaintiff may establish discrimination by either direct or circumstantial evidence. *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 496 (6th Cir. 2008) (citation omitted). "Direct evidence is 'evidence that proves the existence of a fact without requiring any inferences.'" *Id.* (quoting *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006)).

Although plaintiff explained why he felt the "zoo" comment was racial in nature – because of historically derogatory comparisons between blacks and animals such as monkeys, which live in zoos – such an interpretation is not apparent on the face of the remark, "What are you practicing sweeping so you can work at the zoo?" Rather, the conclusion that the remark was racially-motivated requires one to draw an inference that Begley had plaintiff's race in mind when he made the comment, and thus by definition the remark is not direct evidence of racial discrimination. *See, e.g., Idemudia*, 434 F. App'x at 500; *Cecil*, 301 F. App'x at 496.

### 2. Circumstantial Evidence

In the absence of direct evidence, the Court analyzes discrimination claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and modified in *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248 (1981).

The plaintiff first must establish a prima facie case of discrimination, after which the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the alleged discriminatory action. *Burdine*, 450 U.S. at 252-53. This is merely a production burden, not a persuasion burden. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

If the employer proffers such a justification, the plaintiff then must prove by a preponderance of the evidence that the reason offered by the employer is a pretext for intentional discrimination. *Burdine*, 450 U.S. at 253. The ultimate burden of proving the employer's intent to discriminate remains at all times with the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 511.

### a. <u>Prima Facie Case</u>

To make a prima face showing of discrimination, the plaintiff must establish that he or she (1) was a member of the protected class; (2) suffered an adverse employment

action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Colvin v. Veteran's Admin. Med. Ctr.*, 390 F. App'x 454, 457 (6th Cir. 2010) (citation omitted).

The first two elements of the prima facie case are not disputed here: plaintiff is African-American and his employment was terminated. Further, while defendant argues that plaintiff was not "qualified" due to the performance problems for which he was fired, it is well established that a court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Idemudia*, 434 F. App'x at 501 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)).

### 1. "Replacement"

This brings the Court to the fourth prong. Defendant asserts through the affidavits of Haering and Kindzierski that Wild Flavors interviewed Luther Hall, who is African-American, on April 30, 2008, as a replacement for plaintiff as a packer on third shift, and that Hall was hired effective June 9, 2008. (Haering Aff. ¶ 22; Kindzierski Aff. ¶ 34) Thus, defendants have shown that plaintiff was replaced by another African-American individual.

Plaintiff asserts that defendant "brings forward nothing more than the bare conclusive [*sic*] affidavits of Wild's management to support their position" as to who replaced plaintiff. (Doc. 66 at 40). However, where the non-moving party has not impeached the credibility of an affiant -- even a self-interested one -- on the subject at issue, the moving party can rely on such affidavits to demonstrate an absence of a genuine issue of material fact. *See Stratienko v. Cordis Corp.*, 429 F.3d 592, 597-98 (6th Cir. 2005).

Plaintiff then asserts that it is more likely that he was actually replaced by one of five white employees who were hired on May 19, 2008. (Doc. 66 at 41).[11] The record does not support this assertion.

No replacement occurs as a matter of law unless another employee is hired or reassigned to perform the plaintiff's duties. *See Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010). Two of the five white employees plaintiff cites – Craig Claxton and Anthony Stenger – were hired to work second shift (Doc. 65-4 at 28-29), while plaintiff worked third shift. These two individuals thus could not, as a matter of law,

---

[11] Plaintiff states the date of hire of these employees as May 29, but the relevant documents show their effective hire dates as May 19, 2008. (Doc. 65-4 at 25-29).

have been hired to perform plaintiff's job duties.

The three other individuals – Albert Lynn, Aaron Whitley, and Michael Weigel – were hired to work third shift, but they were hired into different areas: Lynn to the Glass Reactor area, Whitley to Sanitation, and Weigel to Dry Blends.  (Doc. 65-4 at 25-27).  It is undisputed that plaintiff at all times worked in the Liquids Department.  These three employees thus also could not have "replaced" plaintiff.

As a matter of law, therefore, plaintiff has not shown that he was replaced by a person outside of the protected class.

### 2.  "Similarly Situated"

Plaintiff argues in the alternative that he can satisfy the fourth prong of the prima facie case because he was treated less favorably than white employees "with the same responsibilities."  (Doc. 66 at 41).

The Sixth Circuit has held that to be similarly situated in the disciplinary context, the plaintiff and his proposed comparator must have engaged in acts of "*comparable seriousness*."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citation omitted).  The Court explained:

To make this assessment, we may look to certain

> factors, such as whether the individuals have dealt
> with the same supervisor, have been subject to the
> same standards and have engaged in the same conduct
> without such differentiating or mitigating
> circumstances that would distinguish their conduct or
> the employer's treatment of them for it. . . .
> However, when such factors are not relevant, we need
> not consider them. . . . *Rather, to determine whether*
> *two individuals are similarly situated with regard to*
> *discipline, we make an independent determination as to*
> *the relevancy of a particular aspect of the*
> *plaintiff's employment status and that of the*
> *[proposed comparable] employee.*

*Id.* (emphasis added) (citations and internal quotations omitted).

Plaintiff identifies ten white employees who he contends are "similarly situated." (Doc. 46 at 11-17).[12] For each, plaintiff asserts that the individual's disciplinary history makes him comparable to plaintiff. There are several problems with plaintiff's arguments.

First, "[s]uperficial similarities between a disciplined employee and his colleagues are not sufficient to show a prima facie case of discrimination." *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008). Plaintiff's reliance on the mere number of write-ups in each individual's file – without regard to other factors -- runs afoul of this principle.

---

[12] At oral argument, plaintiff retracted his assertion that one of the employees listed in his brief, Matt Crawford, was comparable.

Defendant has introduced evidence[13], undisputed by plaintiff, that some of these other employees had been employed by Wild Flavors for years, and that others went significant periods of time without errors or problems. The fact that such individuals had the same or similar number of write-ups as plaintiff is thus not probative of dissimilar treatment, because it is undisputed that plaintiff made errors early in his tenure and then incurred other write-ups in a relatively short period of time. *See Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 564-65 (6th Cir. 2009) (holding that plaintiff could not establish prima facie case because alleged comparators, who had similar instances of tardiness, had longer tenure at company, were not tardy early in their employment, or did not commit infractions within the short period that plaintiff did).

Plaintiff also groups all disciplinary actions together without regard to the nature of the underlying conduct. For example, while plaintiff's write-ups related generally to production errors, he relies on discipline issued to other employees for problems such as attendance and failing to report accidents. This paints with too

_____

[13] Record citations to the evidence of these employees' disciplinary histories are found in defendant's response in opposition to plaintiff's motion for summary judgment. (Doc. 67 at 7-20).

broad a brush.

The Sixth Circuit has held that, at the prima facie stage, employees who engage in conduct of a qualitatively different nature or under materially different circumstances are not "similarly situated" as a matter of law. *See Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011) (rejecting at the prima face stage proposed comparators whose disciplinary infractions were different than those for which plaintiff was fired; "unrelated information about other types of infractions by fellow employees is not relevant for purposes of comparison"); *Colvin v. Veteran's Admin. Med. Ctr.*, 390 F. App'x 454, 458-60 (6th Cir. 2010) (holding alleged comparator not similarly situated to plaintiff even though they held same position as pharmacists, were hired same date, had same supervisor, and both had problems filling prescriptions; plaintiff's errors were qualitatively different with potentially more serious consequences); *Wright*, 455 F.3d at 709 (holding that plaintiff could not establish prima facie case of sex discrimination where he and alleged comparator's acts of misconduct were of different nature and employer could legitimately view them differently); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-31 (6th Cir. 2004) (reversing denial of employer's

motion for judgment as a matter of law after trial because plaintiff failed to establish prima facie case; alleged comparator's misconduct occurred under "significantly differing circumstances"); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-12 (6th Cir. 2002) (plaintiff could not establish prima facie case of race discrimination, even though three white employees holding same position committed same error, because plaintiff caused serious harm to co-worker and others did not).

Thus, plaintiff cannot rely on dissimilar conduct by other employees to satisfy the "similarly situated" prong.

The Court need not parse every detail as to each of these alleged comparators because plaintiff does not dispute the facts that distinguish them, as set forth above and in defendant's evidence. Rather, plaintiff disagrees with the significance that defendant attaches to these distinguishing factors, arguing that the Court should disregard those differences. This argument will be discussed in greater detail below on the question of pretext.

Although the Court believes plaintiff's race discrimination claim likely falters at this stage, because the prima facie burden is not meant to be an onerous one, the Court will proceed in the analysis as if a prima facie

case of race discrimination has been established.

### b. **Pretext**

Once the plaintiff makes out a prima facie case, he then must adduce evidence from which a reasonable finder of fact could infer that Wild Flavor's reasons for terminating plaintiff's employment are a pretext for intentional race discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 148 (2000).

Defendant's stated reason for terminating plaintiff's employment is his record of performance problems and his disruptiveness on the production floor. (Haering Depo. 73). This is obviously a legitimate, nondiscriminatory justification.

Plaintiff must therefore show that this stated reason had no basis in fact, did not actually motivate defendant's decision, or was insufficient to motivate the decision. *See Idemudia*, 434 F. App'x at 503 (citation omitted). Plaintiff may also show that Wild Flavor's decision to terminate his employment was so unreasonable as to give rise to an inference of pretext. *Id.* However, "mere disbelief of an employer's proffered reason is insufficient to support a finding of intentional discrimination." *Noble*, 391 F.3d at 722 (citations omitted).

Plaintiff appears to proceed under the first of these

options, at least with respect to his discipline for the leaking barrels sent to Russia. In a section titled, "Regarding Supposed Poor Performance," plaintiff posits: "Many things could have happened to [the barrels] which might have caused the leak, if it existed at all, within the four months of transit, other than operator error by Mr. Lattimore." (Doc. 66 at 54). This is no doubt true; it is also rank speculation.[14]

Under this Circuit's modified "honest belief" doctrine, as long as the employer demonstrates that it reasonably relied "on the particularized facts that were before it at the time the decision was made," the employee cannot prove pretext, even if the facts turned out to be incorrect. *Wright*, 455 F.3d at 708 (citation omitted). Thus, an employer only has to present evidence that it "made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Plaintiff does not dispute that he packed the barrels in question or that Wild Flavors's computer records reviewed by Kindzierski showed as much. (Lattimore Depo.

---

[14] Plaintiff's speculation does not end there. He further suggests: "Temperature differences between the summer in Kentucky and the temperature in Moscow in December 2007, could have accounted for the leaks." (Doc. 72 at 7 n.21). And, strangely, "Could one speculate that if the Russian shipment was replaced, the 'leaky' barrels were sold on the Russian Black Market?" (Doc. 66 at 47 n.141).

at 346)[15]  Kindzierski's determination that plaintiff was

responsible for the non-conforming shipment was thus based

on specific facts before him: written reports from the

Russian affiliate, photographs of the leaking barrels,

reports from Quality Control that the caps had not been

tightened, and computer records documenting that plaintiff

had packed the shipment.  Although plaintiff denies that he

failed to tighten the caps on the barrels, he has adduced

no evidence from which a reasonable jury could conclude

that Kindzierski's belief to the contrary was not honestly

held or that it was so unreasonable as to be pretextual.

As to other incidents for which plaintiff was

disciplined, he either admits the underlying conduct or

does not remember the incidents.  (Lattimore Depo. at 310,

312, 315-19, 353).  Further, he admitted fault as to the

April 3, 2008, packaging errors which seem to have been the

proverbial straw that broke the camel's back and caused

Kindzierski and Haering to move to terminate his

employment.  (Doc. 52-5 at 32).

Plaintiff argues that these other incidents were

"minor," that they seem "of little import," and that

defendant's managers were "nit picking and carping."  (Doc.

---

[15] Plaintiff's statement that "The reports of leaky bungs in the Russian shipment was decidedly unauthenticated hearsay, and the conclusion that Lattimore did it, was conjecture" (Doc. 66 at 11) is thus highly misleading.

66 at 55; Doc. 72 at 7). However, plaintiff's opinion that the incidents did not warrant the discipline that defendant imposed for them does not raise a triable issue as to pretext. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."). *See also Rutherford v. Britthaven Inc.*, No. 10-5783, 2011 WL 6415109, at *6 (6th Cir. Dec. 21, 2011) (noting that the employer's "business judgment regarding the appropriate response to this [rule] violation is not subject to judicial second-guessing") (citation omitted); *Noble*, 391 F.3d at 724 ("Although [plaintiff] is certainly entitled to his opinion, mere speculation cannot satisfy his burden of proving that [his supervisor] discharged him on account of race.").

Plaintiff also argues that he has shown pretext by way of the evidence, discussed above, of differential treatment of allegedly similarly-situated employees. (Doc. 66 at 52). This argument falls within the third method of showing pretext. *See Rutherford*, 2011 WL 6415109, at *4.

As discussed, defendant has put forward undisputed evidence demonstrating that these employees are distinguishable from plaintiff in relevant respects. Differences in tenure, the types and frequency of their

performance problems or misconduct, and other factors render the allegedly different treatment devoid of legal significance.  The Sixth Circuit has held that such evidence does not raise a triable issue of pretext.  *See id.* at *4-*5 (holding that evidence of misconduct of younger employees did not raise triable issue of pretext on age discrimination claim because the conduct was "materially different" than that of plaintiff); *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 502-03 (6th Cir. 2009) (plaintiff raised no triable issue of pretext where alleged comparator violated different rules than those violated by plaintiff).

As the Court explained in *Ladd*, "we look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's 'motivation and intent' to determine whether the employer was 'motivated by [discrimination].'"  *Ladd*, 552 F.3d at 503 (citation omitted).  Further, "it is within the employer's business judgment to treat differently-situated parties differently."  *Id.*  "Without similarly situated parties, we cannot adjudge the intent of the employer as to [discrimination]."  *Id.*

Thus, because there are differentiating or mitigating circumstances that distinguish the records of the alleged

comparators from plaintiff, no inference of impermissible discrimination may reasonably be drawn from this evidence.

Other evidence cited by plaintiff does not support a finding of pretext. Plaintiff places great weight on Holtzleiter's statement in January 2008, that plaintiff's hire was a "poor decision." (Doc. 72 at 3-4). Although plaintiff goes so far as to characterize this as "direct" evidence of racial discrimination, there is nothing racial on the face of remark. It is undisputed that this statement was made in response to reports of plaintiff not working and of disrupting operations by walking around the production floor with a notebook making notes of what people did and said. And, of course, there is no evidence that Holtzleiter was involved in the decision, made three months later, to terminate plaintiff's employment.

The "statistical" data plaintiff cites is also of no assistance in showing pretext or discrimination. Plaintiff simply attaches Wild Flavor's EEO-1 reports and lists of employees notated as to race. Such raw data – without contextual information such as the number of employees hired or fired within a certain period, information concerning the relevant labor pool, and evidence that eliminates possible non-discriminatory reasons for any disparities – is insufficient to show a pretext for

discrimination.  *See Ballor v. Alcone County Road Comm'n*,
No. 97-1413, 1998 WL 279374, at *3-*4 (6th Cir. May 20,
1998) (citing *Barnes v. GenCorp*, 896 F.2d 1457, 1466 (6th
Cir. 1990)).

Finally, plaintiff's conspiratorial accusations
regarding the "G drive" computer notes that supervisors
kept regarding plaintiff's performance problems raise no
triable issue.  It is not disputed that supervisors made
these notes contemporaneously with the events described
therein in a shared folder for the supervisors' reference.
In his brief, plaintiff characterizes these notes as
"secret," yet plaintiff concedes that the incidents
documented in the file were discussed with him at the time
they occurred.  (Lattimore Depo. at 232).  Plaintiff has
produced no evidence to show that he was singled out from
other employees with respect to such notes.[16]

The Court thus concludes that plaintiff has not
presented circumstantial evidence of pretext that, when
considered with evidence supporting the prima facie case,
would permit a reasonable trier of fact to infer that Wild
Flavors intentionally discriminated against plaintiff on

---

[16] Plaintiff states not only that these notes were "compiled in secret,"
but he also alleges that such notes were put "exclusively" in
plaintiff's file.  (Doc. 66 at 45).  The Court has reviewed plaintiff's
record cite for the latter proposition and finds that it does not
pertain to this issue at all.

the basis of race.

**B.   Age Discrimination**

The ADEA prohibits an employer from discharging an employee "because of such individual's age."  29 U.S.C. § 623(a)(1).  Absent direct evidence, the same burden-shifting framework discussed above applies to plaintiff's claim for age discrimination.  Geiger v. Tower Auto., 579 F.3d 614, 622 (6th Cir.2009).

Plaintiff has established a prima facie case of age description because, in addition to satisfying the first three prongs discussed above, the evidence shows that plaintiff was replaced by Luther Hall, then twenty-seven years old.

This avails plaintiff little, however, because the evidence, even viewed in his favor, does not demonstrate a triable issue as to whether plaintiff's age was a "but for" factor in the termination of his employment.  *See id.* at 620 (citation omitted).

As noted, defendant has set forth its legitimate, non-discriminatory reasons for firing plaintiff: his performance problems and disruptiveness.  As evidence of pretext, plaintiff relies on the same evidence cited in support of his race discrimination claim.  (Doc. 66 at 57-58).

The Court finds nothing in this evidence to suggest that plaintiff's age played any role in his discipline or termination.  The alleged younger comparators are not similarly situated to plaintiff as a matter of law for the reasons already discussed.  Plaintiff cites no other evidence in support of this claim.

Further, plaintiff was over forty when Kindzierski and Haering hired him, and they are the same individuals who recommended his termination less than a year later.  While not dispositive, this "same actor" inference "viewed with the entire record can support a motion for summary judgment." *Daily v. Am. Founders Bank, Inc.*, 667 F. Supp.2d 728, 736 (E.D. Ky. 2009) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 591 (6th Cir. 2003) (en banc)).  Common sense suggests that, having hired plaintiff at age forty-three, Kindzierski and Haering would not be motivated by age bias less than a year later when they fired him, particularly where there is no evidence of any age-related issues or comments during that time.

Therefore, plaintiff has pointed to no evidence from which a reasonable jury could infer that the reasons given for his termination were a cover-up for intentional age discrimination.

## C.  **Retaliation**

Plaintiff's final claim is for retaliation under Title VII.  That is, he alleges he was terminated in response to his complaint about Begley's "zoo" remark.

To establish a prima facie case of retaliation, plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (citation omitted).

"While temporal proximity between an assertion of Title VII rights and an adverse employment action provides highly probative evidence of a causal connection, 'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'"  *Id.*

If the plaintiff establishes a prima facie case of retaliation, the burden of production then shifts to the defendant to proffer a non-discriminatory reason for the adverse employment action.  *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (citation

omitted).  Once the defendant does so, "the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere pretext."  *Id.*  The burden of persuasion, however, remains at all times with the plaintiff.  *Id.*

Plaintiff's complaint regarding Begley's "zoo" remark constitutes protected activity because he perceived the remark as racially discriminatory, and Wild Flavors management was aware of his complaint.  Plaintiff also suffered the adverse employment action of being fired.  The question then is whether that adverse action was causally related to his protected activity.

First, temporal proximity.  The Court will assume that temporal proximity supports plaintiff's claim because, even though approximately four months passed between the time plaintiff complained and his termination, he argues that the discipline imposed for the leaking barrels in January – just a month after his complaint – was retaliatory, and that discipline was part of the pattern of performance problems on which defendant relied in firing plaintiff.

However, it is also undisputed that plaintiff's performance problems began early in his tenure at Wild Flavors *before* Begley made the "zoo" remark.  Although plaintiff downplays the significance of those early

problems, it is nonetheless undisputed that the incidents occurred, that defendant documented them and brought them to plaintiff's attention, and that they marked the beginning of a pattern of problems that began prior to plaintiff engaging in any protected activity and continued thereafter.

Those problems were also reflected in plaintiff's 2007 performance review. While plaintiff labels that review a "hoax" (Doc. 66 at 60), the record is undisputed that Begley prepared the review in October or November 2007, before the December 17, 2007 encounter about which plaintiff complained. (Begley Depo. at 108-09).[17]

"Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1051 (8th Cir. 2007) (citation omitted). *See also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (holding that an inference of retaliation did not arise when gradual adverse job actions based on plaintiff's performance problems began before plaintiff filed EEOC charge, even though he was terminated thereafter); *Spencer*

---

[17] In fact, Haering testified, and it is not disputed, that supervisors were required to submit their reviews to Kindzierski by the first week of December. (Haering Depo. at 27-30).

*v. CSL Plasma, Inc.*, Civil Action No. 3:10-CV-00262 H, 2011 WL 4054715, at *6 (W.D. Ky. Sept. 12, 2011) (rejecting plaintiff's assertion that he was under "increased scrutiny" after engaging in protected activity; plaintiff had prior performance problems which were reflected in poor annual evaluation and concerns expressed by management).

Assuming without deciding, however, that plaintiff has made out a prima facie case of retaliation, the claim fails at the pretext stage for the reasons discussed at length above and for those that follow.

When plaintiff complained about Begley's "zoo" remark, Kindzierski immediately counseled Begley and ordered that he and other supervisors undergo sensitivity training. While plaintiff complains that he was not informed of this action, that suggests no retaliatory motive on the employer's part, as the testimony was undisputed that defendant does not discuss such personnel issues as a matter of company policy.[18]

Kindzierski also met with plaintiff to discuss his concerns.[19]  Plaintiff expresses indignation that

_____

[18]In retrospect, communicating this fact to plaintiff may have diffused the situation, but that is of no legal significance.

[19]In his briefs and in depositions, plaintiff criticized the length of time that passed before Kindzierski and others in management met with him.  However, it is undisputed that these events unfolded during the holidays when plaintiff and others were on vacation at various times.

Kindzierski suggested that plaintiff may have overreacted – based on information given to him by employees he interviewed during the investigation – but again this does not evidence a retaliatory motive.  Thereafter, plaintiff asked to meet with Haering, and she complied.  In an effort to allay plaintiff's concerns about Begley, Haering offered plaintiff the option of changing teams to remove him from Begley's direct supervision.  Plaintiff agreed.  While his briefs in this case criticize that action, plaintiff testified that the move did not upset him.

When plaintiff then asked to speak to someone higher in the company, Haering suggested he speak to Haase, the Vice President of Operations, and she volunteered to set up a meeting.  Plaintiff declined, so Haering gave him Haase's telephone number.  Plaintiff scheduled a meeting with Haase but then cancelled it.  There is no evidence that he made any further effort to pursue the matter.

The Court notes that at no point during these discussions did plaintiff, although he expressed general dissatisfaction with the situation, request that the company take any particular action, nor did he suggest any way that his dissatisfaction could be remedied.[20]

---

[20] Indeed, in his deposition, plaintiff testified that he did not think Begley should have been fired.  (Lattimore Depo. at 254).

Instead, the record reflects that plaintiff – who by his own admission had been keeping a notebook of things that occurred at work which he felt were unfair since October 2007 – increased his note-taking activity, questioning other employees and causing some to remark to supervisors that plaintiff was causing a "commotion." (Lattimore Depo. 172-74, 178, 180-83, 289-90, 295-96). Indeed, in his deposition, plaintiff testified that he conducted "character" investigations of managers by asking other employees questions about such issues as whether the managers were having extramarital affairs. (*Id.*).

Given these undisputed facts, the Court does not accept plaintiff's argument that the ensuing emails expressing consternation about plaintiff not working, about him disrupting the production floor by carrying around a notebook and questioning co-workers, and being a "poor hire" show a retaliatory motive. Plaintiff concedes that he engaged in the conduct which defendant characterized as "disruptive" and he offers no evidence to rebut the evidence proffered by defendant that plaintiff's productivity was low.

As courts have held, "engaging in protected activity does not 'insulate an employee from discipline for violating the employer's rules or disrupting the

workplace.'" *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d
927, 933 (8th Cir. 2011) (citation omitted). *See also
Littleton v. Pilot Travel Ctr., LLC*, 568 F.3d 641, 645 (8th
Cir. 2009) (same).  Were it otherwise, having engaged in
protected activity would render an employee forever
untouchable and prohibit an employer from taking reasonable
measures to address performance or disciplinary problems.
The Court does not believe that to be the intent of Title
VII.

In any event, the emails cited by plaintiff were
exchanged in January 2008, and plaintiff was not terminated
until April.  In the interim, he changed teams and began
reporting to a new supervisor, Don Cosby.[21]  In response to
plaintiff's attempt to tell Cosby about the incident with
Begley, Cosby told plaintiff that he did not want to know
about it, that as far as he was concerned plaintiff had a
"clean slate" with him, and he encouraged plaintiff to work
to "be successful."  (Doc. 51-4 at 26).  Plaintiff has not
disputed this evidence.

Shortly thereafter, however, Cosby reported to
Kindzierski that plaintiff was not working, and plaintiff
made more packaging errors.  It was after these incidents
that Kindzierski and Haering decided that plaintiff's

---

[21] As noted, Cosby is African-American.

employment should be terminated.

This chronology does not support a reasonable inference that defendant fired plaintiff in retaliation for his complaint about Begley's "zoo" remark, and plaintiff's opinion to the contrary, even though genuinely held, cannot raise a triable issue under the above authority.

### *Conclusion*

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 153 (2000). The Court has reviewed this record and concludes that, although plaintiff's employment was terminated -- unfairly so, in his view -- the evidence does not support a finding that defendant took that action on the basis of plaintiff's race, age, or protected activity. Summary judgment in defendant's favor is thus appropriate.

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED** that motion of plaintiff for partial summary judgment (Doc. 49) be, and is hereby, **DENIED,** and the motion of defendant for summary judgment (Doc. 50) be,

and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 23rd day of January, 2012.



Signed By:
_William O. Bertelsman_ WOB
**United States District Judge**